IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SHAWN WRIGHT, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C. A. No. 08-099-GMS |
| | : | |
| JAMES E. LIGUORI; LIGUORI, MORRIS & | : | |
| YIENGST; and WACHOVIA BANK NATIONAL | : | |
| ASSOCIATION, | : | |
| | : | |
| Defendants. | : | |

**OPPOSITION OF DEFENDANTS JAMES E.
LIGUORI AND LIGUORI, MORRIS & YIENGST TO
PLAINTIFF'S MOTION FOR APPOINTMENT OF COUNSEL**

COME NOW, James E. Liguori, and Liguori, Morris & Yiengst (hereinafter "Defendants"), by and through undersigned counsel hereby respond to Plaintiff's Motion for Appointment of Counsel, and in support thereof state as follows:

1.      On or about February 14, 2008, plaintiff filed his *pro se* complaint for money damages against Defendants, which alleged negligence in their representation of plaintiff in a civil action in the State of Delaware, involving the seizure of certain assets (D.I. 2).  By letter dated August 5, 2008, Plaintiff requested *pro bono* counsel, which request the court considered a motion for appointment of counsel (D.I. 24).  This is Defendants' response.

2.      By Court Ordered dated May 16, 2008, this Court directed that "Discovery motions and motions for appointment of counsel filed prior to service will be dismissed without prejudice".  (Order D.I. 14, par. 6)  A review of the instant docket demonstrates that as of the date of plaintiff's motion, plaintiff's complaint has not been served upon co-defendant,

Wachovia Bank.  As of the date of the filing of the Opposition, Plaintiff's complaint has not been served upon co-defendant.

3.    Whereas service has not been perfected, Plaintiff's Motion should be dismissed.

4.    Assuming, *arguendo*, that plaintiff's motion is not dismissed per the Court Order, the motion should be denied in accordance with Delaware law.

5.    This action is currently before the Court on subject matter jurisdiction based on diversity of citizenship.  28 U.S.C.S. 1332.  Plaintiff has pleaded only a common law negligence claim against Defendants.  No federal questions or claims arising under the U.S. Constitution are before this court (D.I. 14).

6.    A Federal District Court sitting in diversity in Delaware must apply Delaware conflict of law rules in determining what state law will govern.  *Whitwell v. Archmere Academy Inc.*, 463 F. Supp. 2d 482 (D. Del. 2006).  In Delaware, the local law of the state which has the "most significant relationship to the occurrence and parties" will govern the rights of the litigants.  *Travelers Indemnity Co. v. Lake*, 594 A.2d 38 (Del, 1991).  The State of Delaware clearly has the most significant relationship to the occurrence and parties, as plaintiff and defendants entered into a contract in Delaware for the Defendants to represent plaintiff's interest in a civil action in a court sitting in the State of Delaware.  Accordingly, Delaware law should apply to this action.

7.    Plaintiff is currently a prisoner at FCI Fairton.  In sum, the instant motion is a request for the appointment of counsel to assist a prisoner in a civil action against a private person.  That being so, the motion should be denied.

8.    Delaware law is well settled on this issue.  The Supreme Court of Delaware has long held that, "There is no authority for the appointment of counsel to assist a prisoner to

initiate a civil action against a private person". *Winward v. Wilkinson Assoc.*, 586 A.2d 1203 (Del. 1990). Plaintiff's claim is a common law negligence claim against James E. Liguori individually, and against the law firm of Liguori, Morris & Yiegnst. While Delaware trial courts have recognized a limited extension of the Constitutional right to counsel, this does not include civil actions in which a private party is sued.

9.      Assuming, *arguendo*, when considering the instant motion, this court utilizes the same analysis as it would in actions against state actors, plaintiff's motion should nevertheless be denied.   *Pro se* litigants proceeding *in forma pauperis* have no constitutional or statutory right to appointed counsel. *Parham v. Johnson*, 126 F.3d 454, 456 (3rd. Cir. 1997) ("The Supreme Court has not recognized nor has the Court of Appeals found a constitutional right to counsel for civil litigants"). It is solely within the Court's discretion to request appointed counsel for indigent civil litigants. 28 U.S.C. § 1915(e)(1). In exercising its discretion, the court must initially determine whether Plaintiff's claim "has arguable merit in fact and law". *Parham v. Johnson, supra.,* at 457 (citing *Tabron v. Grace*, 6 F.3d 147, 155 (3rd Cir. 1993), *cert. denied* 510 U.S. 1196 (1994)). If this threshold is met, the court "must perform the requisite six-factor *Tabron* analysis". *Id.,* 126 F.3d at 459. These factors are:

(1)      The plaintiff's ability to present his or her own case;
(2)      The complexity of the legal issues;
(3)      The degree to which factual investigation will be necessary and the ability of the plaintiff to pursue such investigation;
(4)      The amount a case is likely to turn on credibility determinations;
(5)      Whether the case will require the testimony of expert witnesses;
(6)      Whether the plaintiff can attain and afford counsel on his own behalf. *Id.* at 457 (citing *Tabron*, 6 F.3d at 155-156, 157 n. 5).

While these factors should guide the court in evaluating the appointment of counsel, this list is not exclusive and the court retains broad discretion. *Tabron*, 6 F.3d at 157. The court should also consider that "'[v]olunteer lawyer time is a precious commodity… Because this

resource is available in only limited quantity, every assignment of a volunteer lawyer to an undeserving client deprives society of a volunteer lawyer available for a deserving cause. We cannot afford that waste.'" *Id.*, quoting *Cooper v. A. Sargenti Co.*, 877 F.2d 170, 172 (2d Cir. 1989).

10.     Plaintiff's motion for appointment of counsel consists simply of a letter request to the Clerk's office (D.I. 24). Plaintiff makes no effort to show that the requisite *Tabron* factors have been met, and fails to put forth any facts to indicate that the appointment of counsel is necessary and appropriate in this action. Therefore, plaintiff's motion should be denied on its face.

11.     Plaintiff's motion should nevertheless be denied upon completing the six-factor *Tabron* analysis. The first factor, plaintiff's ability to present his own case, weighs against the appointment of *pro* bono counsel. Plaintiff is obviously capable of presenting his claim without assistance. In his complaint, plaintiff has sufficiently articulated the facts which he believes entitle him to relief (D.I. 2). He has also successfully amended his complaint (D.I. 8). Clearly, plaintiff has demonstrated a sufficient grasp of the English language, and is able to utilize resources such as a typewriter, photocopying machine, pen, paper, and law library services.

12.     Furthermore, plaintiff has significant prior litigation experience. He is obviously familiar with the procedures involved in presenting a lawsuit. Plaintiff has filed several other lawsuits, arising out of the facts and circumstances of his present incarceration, including an action in the United States District Court for the District of New Jersey, challenging the Bureau of Prison's calculation of his release date, pursuant to 18 U.S.C. § 3585. *Wright v. Schultz*, 2008 U.S. Dist. LEXIS 36361 (N.J. Dist. 2008) (Exhibit A). Although Plaintiff was not successful on the merits of his challenge, he clearly demonstrated his ability to articulate the pertinent factual

circumstances and legal issues necessary for the court to make its determination. Finally, plaintiff has not shown the existence of any restraints placed upon him by his confinement, which would prevent him from presenting this action.

13.     The second factor in the *Tabron* analysis, the complexity of the legal issues, also weighs against the appointment of *pro bono* counsel. Plaintiff's claim against Defendants is a simple common law negligence claim. Resolution of the claim will likely turn upon discussions between plaintiff and his former counsel, Mr. Liguori. As the legal issues involved are not complex, it is not imperative that plaintiff be appointed counsel.

14.     The third factor in the *Tabron* analysis, the degree to which factual investigation will be necessary and the ability of the plaintiff to pursue such investigation, weighs against the appointment of counsel. It has not been shown that the present case is one in which a significant factual investigation is necessary. There are no witnesses to the present dispute. The relevant facts are within plaintiff's personal knowledge, and those facts that are not, can be obtained through the tools of written discovery.

15.     The fourth factor, the likelihood that the case will turn on credibility determinations, weighs against the appointment of counsel. Generally, the appointment of counsel may be appropriate if necessary to clarify the prisoner's testimony. Here, however, the prisoner has already pleaded guilty to the distribution of narcotics in excess of 5 kilograms. Attached hereto as Exhibit B is a transcript of the proceedings in the U.S. District Court for the District of New Jersey, in *United States of America v. Shawn Wright,* wherein plaintiff pleaded guilty to the charge. The Honorable Jerome B. Simandle was very precise in his questioning of the plaintiff about the factual bases for the guilty plea. Given the factual basis for the plea, when

considered in light of the fact that this plea resulted in plaintiff's second conviction for distribution of drugs, plaintiff's credibility before a jury is beyond the help of counsel.

16.    The fifth factor, whether the case will require the testimony of expert witnesses, weighs against the appointment of counsel, is as yet, undetermined.  Whereas no discovery has been taken, it is presently impossible to determine whether the alleged negligence is so obvious that expert testimony is unnecessary, or whether the claim hinges on a point so fine as to require it.  This factor militates in favor of neither party.

17.    The final factor, whether the plaintiff can attain and afford counsel on his own behalf, weighs against the appointment of counsel.  Plaintiff's complaint alleges damages of approximately $500,000.   In most civil actions involving an amount in controversy of this magnitude, litigants with meritorious claims, whether imprisoned or not, are usually able to enter into contingent fee agreements with members of the Delaware bar who can advocate on their behalf.  Whereas Plaintiff has made no showing that he has been unable to retain counsel under these or similar terms, it appears that his inability to retain counsel, if real, is a natural result of the strength of his claim as opposed to an inability to pay counsel.

18.    Therefore, under the six-factor *Tabron* analysis used by this court in determining whether *pro se* litigants proceeding *in forma pauperis* have the right to appointed counsel, plaintiff's claims in this action do not warrant the appointment of *pro bono* counsel.

WHEREFORE, based on the foregoing reasons, Defendants respectfully request this Honorable Court enter an order denying plaintiff's motion for appointment of counsel.

**MARKS, O'NEILL,
O'BRIEN & COURTNEY, P.C.**


**/s/ Norman H. Brooks, Jr.**
Norman H. Brooks, Jr. (2568)
913 N. Market Street, Suite 800
Wilmington, DE 19801
*Attorney for Defendants James E. Liguori, and
Liguori, Morris & Yiengst*

{DE114919.1}

# Ex. A

LEXSEE 2008 U.S. DIST. LEXIS 36361

**SHAWN WRIGHT, Petitioner, v. PAUL M. SCHULTZ, Respondent.**

**Civil No. 08-2033 (JBS)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

*2008 U.S. Dist. LEXIS 36361*

**May 1, 2008, Decided**

**NOTICE:**    NOT FOR PUBLICATION

**SUBSEQUENT HISTORY:** Post-conviction relief dismissed at *Wright v. United States, 2008 U.S. Dist. LEXIS 49717 (D.N.J., June 30, 2008)*

**CORE TERMS:** sentence, custody credit, detention, custody, time spent, bail, arrested, probation, commence, administrative remedy, calculation, prison, inmate, habeas petition, federal sentence, term of imprisonment, time served, incarcerated, undersigned, computation, restrictive, confinement, supervised, appearance, prisoner, awaiting, detained, spent, Reform Act, federal law

**COUNSEL:**    [*1] SHAWN WRIGHT, # 40987-050, Petitioner, *Pro se,* Fairton, New Jersey.

**JUDGES:** Jerome B. Simandle, U.S. District Judge.

**OPINION BY:** Jerome B. Simandle

**OPINION**

*SIMANDLE,* **District Judge**

Petitioner Shawn Wright filed a Petition for Writ of Habeas Corpus pursuant to *28 U.S.C. § 2241* challenging the calculation of his federal sentence by the Bureau of Prisons ("BOP"). For the reasons expressed below, this Court will summarily dismiss the Petition.

*I. BACKGROUND*

The Petition challenges the failure of the BOP to give Petitioner prior custody credit, pursuant to *18 U.S.C. § 3585(b),* for the 428-day period Petitioner was released on bond before he surrendered on February 21, 2006, to the BOP at FCI Fairton for service of his 72-month sentence.

On December 21, 2004, Petitioner pled guilty before the undersigned to a one count information charging him

with knowing and intentional distribution and possession with intent to distribute five kilograms or more of cocaine, contrary to *21 U.S.C. § 841(a)(1)* and *(b)(1)(A).* See *United States v. Wright,* Crim. No. 04-0897 (JBS) plea agreement (D.N.J. Dec. 21, 2004). On the same day, the undersigned ordered the release of Petitioner on an unsecured bond in the sum of $ 150,000, subject to Petitioner's [*2] not committing an offense while on release; advising the court, defense counsel and the U.S. attorney in writing before any change of address and phone number; and appearing at all proceedings as required and surrendering for service of any sentence imposed as directed. See *Wright,* Crim. No. 04-0897 order (D.N.J. Dec. 21, 2004). On January 13, 2006, the undersigned sentenced Petitioner to a 72-month term of imprisonment and five years of supervised release, and ordered Petitioner to surrender to the BOP no later than 12:00 p.m. on February 21, 2006. *Id.* judgment (D.N.J. Jan. 13, 2006). The Court recommended that the BOP designate Petitioner to an institution within the State of New Jersey. *Id.* Petitioner self-surrendered to the BOP at FCI Fort Dix on February 21, 2006.

The BOP initially calculated Petitioner's 72-month sentence as commencing on February 21, 2006. On May 23, 2007, Petitioner submitted an Informal Administrative Remedy Resolution Form asking the BOP to award prior custody credit for the 514-day period between his release on bond on December 21, 2004, and February 21, 2006. Petitioner was informally granted prior custody credit for the time he was in custody from November [*3] 3, 2003, through November 7, 2003, but his request for prior custody credit for the time he was released on bond was denied.

Petitioner filed a formal request for administrative remedy which Warden Paul M. Schultz denied on November 8, 2007, on the ground that "[t]he time you request be credited toward your sentence from the date after your bond through the day before you surrendered for service of your sentence is not time spent in Official

Detention" within *18 U.S.C. § 3585(b)*. (Response of Warden Paul Schultz, Administrative Remedy No. 469320-F1, dated Nov. 8, 2007). Petitioner appealed to the Regional Director who denied the appeal on August 15, 2007, on the ground that, pursuant to *18 U.S.C. § 3585(b)*, an inmate is not eligible for any prior custody credit while released from detention. (Decision of D. Scott Dodrill, dated Aug. 15, 2007). Petitioner appealed the Regional Director's decision to the General Counsel. On March 25, 2008, Harrell Watts, Administrator of National Inmate Appeals, denied relief, upholding the denial of prior custody credit for the 428 days Petitioner was released on bond. The decision provides, in relevant part:

> You appeal the Regional Director's response [*4] to your Administrative Remedy in which you request 428 days of prior custody credit toward your federal sentence for time spent on bond from December 21, 2004, through February 21, 2006.
>
> Prior custody credit is governed by the provisions of *18 U.S.C. § 3585(b)* . . .
>
> A review of our records reveals you were arrested by local law enforcement on November 3, 2003, and released on November 7, 2003. You were again arrested on November 14, 2003, and released on December 1, 2003 . . . . This prior custody credit was applied to your sentence computation under the provisions of *subsection (1), of § 3585(b)*.
>
> On April 19, 2004, you were arrested by local authorities for drug charges. You were released on bail on April 21, 2004. On April 28, 2004, you were arrested for violating the conditions of your bail. You remained in jail until September 27, 2004. The local drug charges had been dismissed. This was applied toward your sentence computation as prior custody credit under the provisions of *subsection (2), of § 3585(b)*.
>
> On December 21, 2004, you were arrested by the Drug Enforcement Agency. You were released on bond the same date, December 21, 2004. This one day was applied as prior custody credit [*5] under the provisions of *subsection (1), of § 3585(b)*.
>
> You remained on bond until September 7, 2005, when you were arrested by

local authorities for Assault. You remained in custody until you were arraigned in court on September 8, 2005, at which time you were released. This charge was later dismissed. This was applied a prior custody credit under the provisions of *subsection (2), of § 3585(b)*.

> Title *18 § 3585(b)* prohibits the application of prior custody credit for time an offender is released on bond. Furthermore, the United States Supreme Court, in *Reno v. Koray,* held that time spent under restrictive conditions of release was not "official detention." . . . . Therefore, you are not entitled to prior custody credit under *18 U.S.C. § 3585(b)*, for the time you spent on bond . . . .

(Decision of Harrell Watts, dated March 25, 2008).

Petitioner executed the Petition presently before this Court on April 12, 2008. The Clerk received it on April 25, 2008. The Petition raises one ground:

> Ground One: PETITIONER SHAWN WRIGHT    40987-050    WISH[ES] CREDIT FOR TIME SPENT ON BOND AND SUPERVISED PROBATION AFTER HIS GUILTY PLEA DECEMBER 21, 2004.
>
> Facts: December 21 2004 Shawn Wright pled guilty to Possession [*6] of cocaine. After guilty plea, court judge Jerome B. Simandle released petitioner on $ 150,000 unsecured bond and placed petitioner on Pre-Trial probation. January 13 2006 petitioner was sentenced to 72 months in federal prison and 5 years supervised release. Feb 21 2006 petitioner turned himself in to FCI-FAIRTON in Fairton New Jersey to begin his prison sentence. Afterwards, the I.S.M. (Inmate System Management) Office sent petitioner his calculation sheet.
>
> Petitioner then contacted the I.S.M. Office with complaint concerning his days incarcerated before being placed on bond and Pre trial probation Dec 21 2004. And a complaint concerning credit for being on Bond/Probation before beginning his sentence Feb 21 2006.
>
> Petitioner was granted credit for time incarcerated prior to being placed on

Bond/Probation BUT did *NOT* receive credit for time spent on Bond Probation. Petitioner Shawn Wright submits this 2241 asking the courts to resentence him. In that, he ask that the court reflect in his sentence the time he spent on Bond and Pre-trial.

(Pet. Ground One, p. 4.)

## II. DISCUSSION

### A. Standard of Review

"Federal courts are authorized to dismiss summarily any habeas petition that appears [*7] insufficient on its face." *McFarland v. Scott, 512 U.S. 849, 856, 114 S. Ct. 2568, 129 L. Ed. 2d 666 (1994)*. Dismissal without the filing of an answer has been found warranted when "it appears on the face of the petition that petitioner is not entitled to relief." *Siers v. Ryan, 773 F.2d 37, 45 (3d Cir. 1985), cert. denied, 490 U.S. 1025, 109 S. Ct. 1758, 104 L. Ed. 2d 194 (1989); see also McFarland, 512 U.S. at 856; United States v. Thomas, 221 F.3d 430, 437 (3d Cir. 2000)* (habeas petition may be dismissed where "none of the grounds alleged in the petition would entitle [the petitioner] to relief"); *United States v. Dawson, 857 F.2d 923, 928 (3d Cir. 1988)*. [1]

> 1   *Habeas Rule 4* requires a judge to *sua sponte* dismiss a habeas petition without ordering a responsive pleading "[i]f it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief in the district court." 28 U.S.C. § 2254 *Rule 4*, applicable to § 2241 petitions through *Rule 1(b); see also Mayle v. Felix, 545 U.S. 644, 655, 125 S. Ct. 2562, 162 L. Ed. 2d 582 (2005).*

### B. Jurisdiction

Under *28 U.S.C. § 2241(c)*, habeas jurisdiction "shall not extend to a prisoner unless . . . [h]e is in custody in violation of the Constitution or laws or treaties of the United States." *28 U.S.C. § 2241(c)(3)*. A federal [*8] court has subject matter jurisdiction under *§ 2241(c)(3)* if two requirements are satisfied: (1) the petitioner is "in custody" and (2) the custody is "in violation of the Constitution or laws or treaties of the United States." *28 U.S.C. § 2241(c)(3); Maleng v. Cook, 490 U.S. 488, 490, 109 S. Ct. 1923, 104 L. Ed. 2d 540 (1989)*. The federal habeas statute requires that the petitioner be in custody "under the conviction or sentence under attack at the time his petition is filed." *Lee v. Stickman, 357 F.3d 338, 342 (3d Cir. 2004)* (quoting *Maleng, 490 U.S. at 490-91*).

This Court has subject matter jurisdiction under *§ 2241* to consider the instant Petition because Petitioner challenges the calculation of his sentence under federal law and he was incarcerated in New Jersey at the time he filed the Petition. *See Vega v. United States, 493 F. 3d 310, 313 (3d Cir. 2007)* (challenge to BOP's failure to give credit for time served prior to federal sentencing is cognizable under *§ 2241*); *Woodall v. Fed. Bureau of Prisons, 432 F.3d 235, 241 (3d Cir. 2005)* (challenge to BOP's failure to transfer inmate to community corrections center may be brought under *§ 2241*); *Barden v. Keohane, 921 F. 2d 476, 478-79 (3d Cir. 1991)* (challenge to BOP's [*9] refusal to decide whether to designate state prison as place of federal confinement); *Gomori v. Arnold, 533 F. 2d 871, 874 (3d Cir. 1976)* (challenge to erroneous computation of release date); *Soyka v. Alldredge, 481 F. 2d 303 (3d Cir. 1973)* (claim for credit for time served prior to federal sentencing).

### C. Sentence Calculation

The United States Code specifies that a federal sentence commences on the date the prisoner is received at the detention facility at which the sentence is to be served. *See 18 U.S.C. § 3585(a)*. Section 3585(b) gives the BOP authority to credit against the sentence time served prior to the commencement of the sentence. *Section 3585(a) and (b) provide*, in relevant part:

> (a) Commencement of sentence.--A sentence to a term of imprisonment commences on the date the defendant is received in custody awaiting transportation to, or arrives voluntarily to commence service of sentence at, the official detention facility at which the sentence is to be served.

> (b) Credit for prior custody.--A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences--

> (1) as a result of [*10] the offense for which the sentence was imposed; or

> (2) as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed;

> that has not been credited against another sentence.

*18 U.S.C.A. § 3585 (a), (b).*

Under *§ 3585(a)*, Petitioner's sentence commenced on February 21, 2006, the date he was taken into federal custody when he self-surrendered, pursuant to the judgment of conviction. *See 18 U.S.C. § 3585(a). Section 3585(b)* authorizes the BOP to give a prisoner credit for time "spent in official detention prior to the date the sentence commences." *18 U.S.C. § 3585(b).* In *Reno v. Koray, 515 U.S. 50, 115 S. Ct. 2021, 132 L. Ed. 2d 46 (1995)*, the Supreme Court held that a defendant is not in "official detention," within the meaning of *§ 3585(b)*, and therefore not entitled to prior custody credit, during the time he was ordered released on the condition that he be confined to a community treatment center without authorization to leave unless accompanied by a government agent. The Court reasoned:

> The Bail Reform Act of 1984 provides a federal court with two choices when dealing with a criminal defendant who has been "charged with an offense" and is awaiting [*11] trial, *18 U.S.C. § 3142(a)*, or who "has been found guilty of an offense and ... is awaiting imposition or execution of sentence," *18 U.S.C. § 3143(a)(1)* .... The court may either (1) "release" the defendant on bail or (2) order him "detained" without bail. A court may "release" a defendant subject to a variety of restrictive conditions, including residence in a community treatment center. *See §§ 3142(c)(1)(B)(i), (x),* and *(xiv).* If, however, the court "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," *§ 3142(e)*, the court "shall order the detention of the person," *ibid.*, by issuing a "detention order" "direct[ing] that the person be committed to the custody of the Attorney General for confinement in a corrections facility," *§ 3142(i)(2).* Thus, under the language of the Bail Reform Act of 1984, a defendant suffers "detention" only when committed to the custody of the Attorney General; a defendant admitted to bail on restrictive conditions, as respondent was, is "released."

*Reno v. Koray, 515 U.S. at 57.* [2]

2 *Section 3142(a)* provides:

> **(a) In general.** Upon the appearance [*12] before a judicial officer of a person charged with an offense, the judicial officer shall issue an order that, pending trial, the person be -
>
> > **(1)** released on personal recognizance or upon execution of an unsecured appearance bond, under subsection (b) of this section;
> >
> > **(2)** released on a condition or combination of conditions under subsection (c) of this section;
> >
> > **(3)** temporarily detained . . . under subsection (d) of this section; or
> >
> > **(4)** detained under subsection (e) of this section.

*18 U.S.C. § 3142(a).*

This Court holds that the BOP correctly determined that Petitioner is not entitled to prior custody credit under *§ 3585(b)* for the time he was released on bond between December 21, 2004, and February 21, 2006. *See id.; Cucciniello v. Keller, 137 F. 3d 721, (2nd Cir. 1998)* (time spent on home confinement as a condition of bail release is not "official detention" under *§ 3585(b)*); *Rodriguez v. Lamer, 60 F. 3d 745, 747-48 (11th Cir. 1995)* (time spent under "house arrest" is not "official detention" under *§ 3585(b)*). Because the BOP did not abuse its discretion or violate federal law in denying Petitioner prior custody credit for the time he was released on bond, this Court will dismiss the Petition [*13] with prejudice. [3]

3 To the extent Petitioner asks this Court to re-sentence him, *see* Pet. p. 4, the request is denied for lack of jurisdiction. *See 18 U.S.C. § 3582(c);*

*United States v. Higgs, 504 F. 3d 456, 464 (3d Cir. 2007) (section 3582(c)* limits the jurisdictional authority of district courts to entertain a motion for reduction of sentence).

### III. CONCLUSION

For the reasons set forth above, the Court dismisses the Petition for a Writ of Habeas Corpus.

/s/ **Jerome B. Simandle**

**JEROME B. SIMANDLE**

U.S. District Judge

Dated: *May 1,* 2008

# Ex. B

1

2

3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

4    UNITED STATES OF AMERICA

5              -vs-

CRIMINAL NUMBER:

6    SHAWN WRIGHT,

04-897

7         Defendant.

8         Mitchell H. Cohen United States Courthouse
          One John F. Gerry Plaza
9         Camden, New Jersey 08101
          DECEMBER 21, 2004

10

11   B E F O R E:          HONORABLE JEROME B. SIMANDLE
                           UNITED STATES DISTRICT JUDGE

12

13        A P P E A R A N C E S:

14   CHRISTOPHER J. CHRISTIE, UNITED STATES ATTORNEY
     BY: WILLIAM FITZPATRICK
15   ASSISTANT UNITED STATES ATTORNEY

16   MICHAEL PINSKY, ESQUIRE
     ATTORNEY FOR DEFENDANT

17

18

19

20

21

22

23

24

25                       Carl J. Nami, CSR
                         Official Court Reporter
                         New Jersey CSR #557

1                    (open court)

2          THE DEPUTY COURT CLERK:  All rise.

3          THE COURT:  Be seated, please.  Okay.  Good

4   afternoon.  This is the case of United States versus Shawn

5   Wright.  And the case does not yet have a criminal number.

6   I'll ask counsel to please enter their appearances.

7          MR. FITZPATRICK:  Good afternoon, Your Honor.

8   William Fitzpatrick on behalf of the United States.

9          MR. PINSKY:  Good afternoon, Your Honor.  And happy

10  holiday.  Your Honor, Michael Pinsky representing Shawn

11  Wright.

12         THE COURT:  Good afternoon, Mr. Pinsky.  Okay.  Mr.

13  Fitzpatrick, you may proceed.

14         MR. FITZPATRICK:  Thank you, Your Honor.  Your Honor,

15  Mr. Wright is before the court this afternoon to enter a

16  guilty plea to a one count criminal information which charges

17  Mr. Wright with knowingly and intentionally distributing and

18  possessing with intent to distribute more than five kilograms

19  of cocaine, a Schedule II narcotic drug controlled substance.

20  For this offense the maximum penalty is a term of life

21  imprisonment.  There is a mandatory minimum 10 year term of

22  imprisonment, a fine not to exceed four million dollars and at

23  least five years of supervised release.

24         The parties have entered into a plea agreement.  The

25  terms and conditions of the plea agreement are memorialized in

1   a letter dated July 9, 2004 from Miss Carle of my office to

2   Mr. Pinsky.  The plea agreement is a cooperation plea

3   agreement between the Government and Mr. Wright.  The plea

4   agreement sets forth the entire agreement between the United

5   States and Mr. Wright.  The Government is not aware of any

6   reason why Mr. Wright should not enter into a plea knowingly,

7   voluntarily and intelligently.

8            THE COURT:  Okay.  Thank you.  Mr. Pinsky, do you

9   agree that there's a plea agreement in this case?

10           MR. PINSKY:  There is a written a plea agreement,

11  Your Honor.  We have seen it, reviewed it, signed it.

12           THE COURT:  Okay.  I'll mark this letter dated July 9

13  as exhibit C-1 for purposes of today's hearing.

14           Okay.  The first order of business is whether the

15  defendant wishes to waive his right to indictment and permit

16  the case to proceed by way of a criminal information.  Mr.

17  Pinsky, have you discussed with Mr. Wright his right to have

18  the case indicted by a Grand Jury?

19           MR. PINSKY:  Yes, I have, Judge.

20           THE COURT:  Does he wish to waive that right?

21           MR. PINSKY:  Yes, he does, Your Honor.

22           THE COURT:  Do you believe his waiver is knowing and

23  voluntarily?

24           MR. PINSKY:  I do, Your Honor.

25           THE COURT:  Have you witnessed his signing the waiver

*United States District Court*
*Camden, New Jersey*

1    of indictment form?

2            MR. PINSKY:  Yes, Judge.

3            THE COURT:  Okay.  I'm going to accept Mr. Wright's

4    waiver, and all further proceedings by way of criminal

5    information.  I have been supplied with the original criminal

6    information signed by Christopher Christie.

7            And, Mr. Pinsky, have you received a copy of that

8    charge?

9            MR. PINSKY:  Yes, we have, Your Honor.

10           THE COURT:  Has Mr. Wright read it?

11           MR. PINSKY:  Yes, he has, Your Honor.

12           THE COURT:  Do you believe he understands it?

13           MR. PINSKY:  Yes.

14           THE COURT:  Do you waive a reading of the criminal

15   information at this time?

16           MR. PINSKY:  We do so waive, Judge.

17           THE COURT:  All right.  Now, this is Mr. Wright's

18   initial appearance on this charge.  So I'll ask you to please

19   stand.  Now do you understand you have a right to remain

20   silent?

21           THE DEFENDANT:  Yes, I do.

22           THE COURT:  And do you understand that you don't have

23   to answer any of the court's questions today and that anything

24   you choose to say will be held against you?

25           THE DEFENDANT:  Yes.

1          THE COURT:  Do you also understand you have a right

2  to have your attorney present during all court proceedings?

3          THE DEFENDANT:  Yes, I do.

4          THE COURT:  Do you also understand that if any law

5  enforcement officer asks any questions, you have a right to

6  remain silent?

7          THE DEFENDANT:  Yes.

8          THE COURT:  And, finally, you understand that

9  anything you choose to say to a law enforcement officer can

10  also be held against you?

11          THE DEFENDANT:  Yes, I do.

12          THE COURT:  And also if any law enforcement officer

13  tries to ask you any questions, you understand you have a

14  right to have your attorney present before you talk with him?

15          THE DEFENDANT:  Yes.

16          THE COURT:  All right.  Do you have any questions

17  about these warnings?

18          THE DEFENDANT:  No.

19          THE COURT:  And have you read the criminal charge

20  that was filed by the Government today?

21          THE DEFENDANT:  Yes, I have.

22          THE COURT:  Do you understand it?

23          THE DEFENDANT:  Yes, I do.

24          THE COURT:  Do you understand that you're charged

25  with knowingly and intentionally distributing, possession with

*United States District Court*
*Camden, New Jersey*

1    intent to distribute more than five kilograms of cocaine?

2             THE DEFENDANT:  Yes.

3             THE COURT:  How do you wish to plead to that charge,

4    not guilty or guilty?

5             THE DEFENDANT:  I plead guilty.

6             THE COURT:  I have a couple of preliminary questions

7    for your attorney.  So you may sit down.  And I'll ask Mr.

8    Pinsky just a few more questions.

9        Now, Mr. Pinsky, you did assist Mr. Wright in preparing

10   this application for permission to enter a plea of guilty?

11            MR. PINSKY:  I did, Your Honor.

12            THE COURT:  Okay.  I'll mark the application as

13   Exhibit C-2.  And did you witness Mr. Wright's signature on

14   the application today?

15            MR. PINSKY:  Yes, I did, Your Honor.

16            THE COURT:  Now, have you reviewed with Mr. Wright

17   the evidence that the Government says it has against him in

18   this case?

19            MR. PINSKY:  Yes, I have, Judge.

20            THE COURT:  Have you also reviewed with him his

21   constitutional rights to a trial by jury and so on?

22            MR. PINSKY:  I have, your Honor.

23            THE COURT:  Do you believe he understands those

24   rights?

25            MR. PINSKY:  Yes, Your Honor, fully.

1          THE COURT:  Do you believe that his decision to waive

2   those rights is also knowing and voluntary?

3          MR. PINSKY:  I do, Your Honor.

4          THE COURT:  Have you gone over the plea agreement

5   with Mr. Wright?

6          MR. PINSKY:  Many times, Your Honor.

7          THE COURT:  And do you believe that he understands

8   it?

9          MR. PINSKY:  Fully.

10         THE COURT:  Do you believe he accepts it?

11         MR. PINSKY:  I do, Your Honor.

12         THE COURT:  And did you witness his signature on Page

13  5 of the plea agreement?

14         MR. PINSKY:  I did, Judge.

15         THE COURT:  And do you recall which date it was

16  signed?

17         MR. PINSKY:  It was the middle of July, Judge.

18         THE COURT:  Okay.  Because the date here is blank.

19         MR. PINSKY:  I believe, Judge, it was the tenth.

20         THE COURT:  Okay.  The day after the letter was

21  written.

22         MR. PINSKY:  It was faxed to me first.

23         THE COURT:  Okay.  Has anything changed about the

24  plea or about your client's understanding either from July

25  10th until today?

```
 1          MR. PINSKY:  No, Your Honor.

 2          THE COURT:  Is this the complete plea agreement

 3  between your client and the United States?

 4          MR. PINSKY:  It is, Judge.

 5          THE COURT:  Does it fully spell out the terms of the

 6  cooperation aspect of the plea agreement?

 7          MR. PINSKY:  Yes, it does.

 8          THE COURT:  And have you explained to your client the

 9  stipulations in Schedule A of the plea agreement?

10          MR. PINSKY:  I have.

11          THE COURT:  Have you also explained to him the

12  Sentencing Guidelines and how they work?

13          MR. PINSKY:  I have.

14          THE COURT:  And do you believe he understands all of

15  that?

16          MR. PINSKY:  I believe he does, Judge.

17          THE COURT:  Do you believe that his decision to plead

18  guilty is knowing and voluntary.

19          MR. PINSKY:  I do, Judge.  Judge, on question Number

20  5 of the application, I inadvertently left off the grade he

21  completed.  I believe on Number 5 his education stopped after

22  -- how much college did you have?  After one year of college,

23  Judge.

24          THE COURT:  Okay.

25          MR. PINSKY:  And --
```

*United States District Court*
*Camden, New Jersey*

1          THE COURT:  I'll just fill that in.  Have you

2    discussed his partial waiver of a right to appeal, his partial

3    right of a -- to file a 2255?  I'm speaking now, of course, of

4    Paragraph 6 of the stipulation.  Do you believe that he

5    understands the contours of that waiver?

6          MR. PINSKY:  I do, Judge, fully.

7          THE COURT:  And do you have any reason why I should

8    not accept his waiver of appeal and his waiver of

9    post-conviction petition in the event that he's sentenced at a

10   level 29 or less?

11         MR. PINSKY:  No, Judge.  I believe he fully

12   understands.  There's no reason he shouldn't accept it.

13         THE COURT:  Finally, do you know of any reason why I

14   should not accept Mr. Wright's plea of guilty?

15         MR. PINSKY:  None, Your Honor.

16         THE COURT:  And all things considered, do you believe

17   it is in Mr. Wright's best interest to enter this plea?

18         MR. PINSKY:  Yes, it is, Judge.

19         THE COURT:  Okay.  Thank you again, sir.  Mr. Wright,

20   I'd like to ask you some questions under oath.  And do you

21   wish to swear or do you affirm?

22         THE DEFENDANT:  Affirm.

23         THE COURT:  Okay.

24   (**SHAWN WRIGHT**, HAVING DULY AFFIRMED AS A WITNESS TESTIFIED AS

25   FOLLOWS:)

WRIGHT - BY THE COURT

1  (EXAMINATION OF MR. WRIGHT BY THE COURT)

2      THE DEFENDANT:  Shawn Wright.  S-h-a-w-n.

3  W-r-i-g-h-t.

4  Q.  Okay.  Mr. Wright, do you understand that you have just

5  promised to tell the truth but if you knowing lie to me, that

6  you could be subject to the penalty of perjury?

7  A.  Yes.

8  Q.  So if I say something that's unclear or that you're not

9  understanding, just tell me so and I'll go back and try to

10  make it more plain.  Okay?  So don't guess at what I'm saying.

11  All right?  And you have to yes or no.

12  A.  Yes.

13  Q.  And if at any time you need more time to discuss anything

14  with your attorney, just tell me so and we'll take a break so

15  that you and Mr. Pinsky can have any discussions you need to

16  have in private before we would go forward today.  Will do you

17  that?

18  A.  Yes.

19  Q.  Okay.  You can be seated.  There's quite a few questions.

20  Now, do you understand the charge against you?

21  A.  Yes.

22  Q.  And have you read the criminal information that contains

23  that charge?

24  A.  Yes, I have.

25  Q.  Have you reviewed this charge with your attorney?

1    A.    Yes, I have.

2    Q.    Have you, also, reviewed with Mr. Pinsky the evidence

3    that the government says it has against you?

4    A.    Yes.

5    Q.    Do you understand you have a choice to make, you can

6    plead not guilty, in which case you'll be preserving all your

7    rights and your case will be scheduled for a jury trial or you

8    can plead guilty in which case there will be no trial.  Do you

9    understand that?

10    A.    Yes, I do.

11    Q.    Have you discussed this choice with Mr. Pinsky?

12    A.    Yes.

13    Q.    And has he helped you to weigh the pluses and minuses of

14    pleading guilty versus going to trial?

15    A.    Yes, he has.

16    Q.    Now is it your own personal choice to plead guilty?

17    A.    Yes.

18    Q.    Has anyone forced you to plead guilty?

19    A.    No.

20    Q.    And are you pleading guilty of your own free will?

21    A.    Free will, yes.

22    Q.    Has anyone promised you anything in connection with

23    pleading guilty other than what's in your written plea

24    agreement?

25    A.    No, they haven't.

WRIGHT - BY THE COURT

1  Q.    And am I correct that your entire plea agreement is in

2  Exhibit C-1 which is the letter of July the 9th?

3  A.    Yes.

4  Q.    Do you have a copy of your plea letter in front of you?

5  A.    I don't have one with me.

6          MR. PINSKY:  Here it is, Judge.

7          THE COURT:   Okay.

8  Q.    And, Mr. Wright, have you personally read your plea

9  agreement letter?

10  A.    Yes, I have.

11  Q.    Have you also read the stipulations that are attached to

12  the letter?

13  A.    Yes.

14  Q.    And have you gone over them with your attorney?

15  A.    Yes, I have.

16  Q.    Has he explained to you what the plea agreement means?

17  A.    Yes.

18  Q.    And do you have any questions about anything in the plea

19  agreement?

20  A.    No, sir.

21  Q.    Is there anything in here that you don't understand?

22  A.    No.

23  Q.    Do you accept these stipulations as true and correct?

24  A.    Yes.

25  Q.    Do you accept them as part of your plea agreement?

WRIGHT - BY THE COURT

1  A.   Yes, I do.

2  Q.   But by accepting the stipulations, do you understand that

3  that means you're bound by them, and so is the U. S. Attorney?

4  Neither side can argue to me something at sentencing which is

5  different from what you stipulated to here, if your argument

6  contradicts what is stipulated to?

7  A.   Yes, I understand that.

8  Q.   Okay.  Do you, also, understand, though, that these

9  stipulations are not binding on the court.  If I find that the

10  actual facts are different or if I find that the law has to be

11  applied differently, then I can disregard the stipulation and

12  make a finding and sentence you based upon the facts as I find

13  them to be or the law as I find it to be?  Do you understand

14  that?

15  A.   Yes, I do.

16  Q.   And do you understand that you'll not be permitted to

17  withdraw your plea of guilty on the ground that the court

18  rejects one or more of these stipulations?

19  A.   Yes.

20  Q.   And my rejecting a stipulation, it could help you or it

21  could hurt you.  There's no way that I have of knowing now

22  which way that would go.  But it is possible that it could be

23  to your detriment.  In other words, that you would lose some

24  benefit that you thought you were getting.  Do you understand

25  that?

WRIGHT - BY THE COURT

1   A.   Yes, I do.

2   Q.   And do you accept this plea agreement?

3   A.   Yes.

4   Q.   Did you sign it on Page 5?

5   A.   Yes, I did.

6   Q.   And is it correct that you signed it back in July?

7   A.   Yes.

8   Q.   And has anything changed about the plea agreement or

9   about your understanding of it from July until today?

10  A.   No, it hasn't.

11  Q.   Has anyone promised you anything different about

12  cooperation other than what's in the plea agreement?

13  A.   No.

14  Q.   And is this the full agreement with regard to your

15  cooperation?

16  A.   Yes, it is.

17  Q.   Now do you understand that you'll lose the benefit of

18  cooperation if you commit perjury during the course of your

19  cooperating?

20  A.   Yes.

21  Q.   And do you also understand that you'll lose the benefit

22  of cooperation if you fail to tell the whole story to the

23  Government in their efforts to prosecute someone else?

24  A.   Yes.

25  Q.   And do you understand that if you do assist the

WRIGHT - BY THE COURT

1  Government in its prosecution of someone else, that the

2  Government has promised to make an application to me before

3  sentencing to give you the benefit of a downward departure

4  under Section 5(k)1.1 of the Sentencing Guidelines as well as

5  Section 3553(e) of the Federal statute?  Do you understand

6  that?

7  A.   Yes.

8  Q.   Do you understand that the decision about your sentence

9  -- well let's take one step at a time.  If there's good cause

10 for me to depart downward, then, of course, I'll do so and

11 that's almost always the case.  But it can't be guaranteed

12 until I see what the facts are of your cooperation.  If I do

13 grant your cooperation departure, then your sentence is in my

14 hands.  The place for where your sentence ends up is in my

15 discretion as the sentencing Judge taking into account all the

16 important facts of your cooperation.  Do you understand that?

17 A.   Yes.

18 Q.   And do you have any questions so far about anything I've

19 said?

20 A.   No, I don't, sir.

21 Q.   All right.  Now before I can accept your plea of guilty,

22 I have to make sure you understand the constitutional rights

23 that you have.  Now you're charged with a serious crime today

24 in this criminal information.  Even though it's a serious

25 charge, do you understand that you're presumed by law to be

WRIGHT - BY THE COURT

1    innocent of this charge?

2    A.    Yes.

3    Q.    In other words, you're entitled to the presumption of

4    innocence.  Do you realize that?

5    A.    Yes, I do.

6    Q.    If you plead not guilty, then your case will be scheduled

7    for trial.  And I'd like to take a minute to review what your

8    trial rights are.  First, do you understand you have a right

9    to be represented by your attorney?

10   A.    Yes.

11   Q.    Also you have a right to cross examine the witnesses that

12   the government calls to testify against you?

13   A.    Yes.

14   Q.    Now you understand that you have a right to trial by

15   jury?

16   A.    Yes, I do.

17   Q.    And a trial by jury means that the Government has the

18   burden of proving your guilt beyond a reasonable to a

19   unanimous jury of 12 persons, and if they don't succeed in

20   doing that, then you can't be convicted of this crime.  Do you

21   understand that?

22   A.    Yes, I do.

23   Q.    Unanimous means that all 12 jurors have to agree on the

24   verdict.  They have to all find that the Government has proved

25   the case.  If even one juror disagrees, then the verdict is

WRIGHT - BY THE COURT

1   not unanimous and you cannot be convicted by that jury.  Do

2   you understand that?

3   A.   Yes.

4   Q.   Do you also understand that at the trial, you have a

5   right to remain silent?

6   A.   Yes, I do.

7   Q.   In other words, you have a constitutional right to not

8   testify.  And if so, I would inform the jury they cannot use

9   your silence against you nor can they consider it in any way.

10  Do yo understand that?

11  A.   Yes.

12  Q.   Do you also understand you have a right to testify at

13  trial.  In other words, it's your choice that if you want to

14  get on the witness stand and to offer to the jury the evidence

15  you would like them to consider about your case, then you have

16  a right to do so.  Do you understand that?

17  A.   Yes, I do.

18  Q.   You also have a right to call witnesses in your own

19  behalf.  Do you understand that?

20  A.   Yes.

21  Q.   And you have a right to require documents or things to be

22  produced here in the courtroom if they're relevant to the case

23  and they would aid in your defense.  Do you understand that?

24  A.   Yes, I do.

25  Q.   Now when I said that the Government has the burden of

WRIGHT - BY THE COURT

1  proving your guilt beyond a reasonable, do you understand that

2  that extends and requires them to prove your guilt on each of

3  the essential elements of the crime.  Do you realize that?

4  A.   Yes.

5  Q.   And if they failed to prove your guilt on even one of the

6  essential elements, then you cannot be convicted in this case.

7  Do you understand that?

8  A.   Yes.

9  Q.   Now, do you wish to give up all of these rights and enter

10 a plea of guilty?

11 A.   Yes, I do, Your Honor.

12 Q.   Do you wish also to give up your right to silence and

13 answer the questions that I have to ask you about the factual

14 basis of your case?

15 A.   Yes.

16 Q.   All right.  Before I can accept your plea of guilty, I

17 have to make sure you understand the consequences of pleading

18 guilty.  Do you understand that a plea of guilty has the same

19 force and effect as if a jury found you guilty after a trial?

20 A.   Yes.

21 Q.   In other words, the plea of guilty is a conviction and

22 all that remains of your case is to schedule the sentence,

23 typically for about three months from now.  Do you understand

24 that?

25 A.   Yes.

WRIGHT - BY THE COURT

1  Q.  Now I would be the sentencing Judge and I have no idea

2  what your sentence should be as I sit here because I don't

3  know anything about your case.  The only guarantee I can make

4  to you is that it cannot exceed the maximum penalty provided

5  by law which, unfortunately in this case, is life in prison.

6  Do you understand that?

7  A.  Yes.

8  Q.  And do you understand that life in prison does mean life?

9  It means that if a person is sentenced to life in prison in

10  the Federal system, there is no parole, and they actually have

11  to spend the rest of their life in prison?

12  A.  Yes.

13  Q.  Do you also understand that there's a ten year mandatory

14  minimum that must be imposed for this crime?

15  A.  Yes.

16  Q.  In other words, if you're convicted, you have to be

17  sentenced to at least ten years in prison is the minimum

18  sentence allowed by law, and the only exception to that would

19  be if you gain the benefit of a departure downward for

20  cooperation and if I determine that assistance lessens the ten

21  year mandatory minimum is appropriate.  Do you understand

22  that?

23  A.  Yes.

24  Q.  Now it is possible that you could win a downward

25  departure for cooperation, and that your sentence would depart

1    downward from the Guidelines, but it would not necessarily

2    have to depart below the mandatory minimum of ten years.  Do

3    you understand that?

4    A.    Yes.

5    Q.    So, again, it's a possibility, and until I have a chance

6    to weigh all the factors in your case, I can't make any

7    promise about what a downward departure will result in for

8    you.  Do you understand that?

9    A.    Yes.

10   Q.    Now have you discussed the Sentencing Guidelines with

11   your attorney?

12   A.    Yes, I have.

13   Q.    And do you understand the general terms, how they work?

14   A.    Yes.

15   Q.    And do you understand that the Guidelines require me to

16   compute the overall scores.  One is called your total offense

17   conduct score and the other is called your criminal history

18   category.  Do you understand that?

19   A.    Yes.

20   Q.    Now the total offense conduct score is a score that

21   starts with the base offense level for this offense which I

22   believe is a level 32, and then the score can be increased or

23   decreased depending upon the specifics of your case.  Do you

24   understand that.

25   A.    Yes.

WRIGHT - BY THE COURT

1   Q.   For instance, by pleading guilty and accepting

2   responsibility and assuming that continues until trial, your

3   score is reduced, it could be reduced by up to three levels.

4   Do you understand that?

5   A.   Yes.

6   Q.   On the other hand, if you obstruct justice, your score

7   could be increased.  Do you understand that?

8   A.   Yes.

9   Q.   Or if you played a major role in this offense, then there

10  could be a role adjustment upward of two or three or even four

11  points?  Do you understand that?

12  A.   Yes.

13  Q.   And there can be other adjustments that are called for.

14  For instance, if there were any weapons used in connection

15  with the offense, or if there is any other weapons, the

16  relevant offense conduct, that is other crimes that were

17  committed in order to -- well, other crimes that were

18  committed in connection with this drug distribution offense.

19  Do you that?

20  A.   Yes.

21  Q.   They can also be taken into account.  The second score,

22  as I said, is your criminal history category.  That requires

23  the Probation Department to run your record and to see what

24  crimes you've been convicted on and to assign certain scores

25  to each of those crimes depending upon the nature of the crime

WRIGHT - BY THE COURT

1  and also such factors as whether you are on probation or

2  parole at the time when the crimes were committed.  Those

3  points are added up and those points when added up, determine

4  what your criminal history category is.  Do you understand

5  that?

6  A.    Yes.

7  Q.    So the worse -- the criminal history, obviously the worse

8  becomes your guideline score.  Do you understand that?

9  A.    Yes.

10  Q.    Now when these scores have been added up, when I resolve

11  any disputes that might exist about the scoring, after a

12  hearing where both sides have a chance to be heard, then we

13  can look at the chart and determine what your guideline range

14  actually is.

15      Have you looked at that chart and in the back of the

16  guideline book?

17  A.    Yes, I have.

18  Q.    Have you looked at it with Mr. Pinsky?

19  A.    Yes, I have.

20  Q.    Your guideline range will end up being somewhere on that

21  chart, but I can't promise where because I don't know what

22  your scores are going to be.

23  A.    Right.

24  Q.    But where the two scores meet on the chart, those numbers

25  will then describe the guideline range.  And you can assume

1    that your sentence will be somewhere in the guideline range

2    between the low end and the high end of that range.  Do you

3    understand that?

4    A.    Yes.

5    Q.    Now, we've already discussed the concept of the downward

6    departure, if you render substantial assistance to the

7    Government.  Do you have any questions about that?

8    A.    No.

9    Q.    And there may be other kinds of departures for which you

10   may be eligible.  I don't -- well, in your plea agreement it

11   says that there is no basis for any other upward or downward

12   departures other than the possibility of one for cooperation.

13   Do you agree with that?

14   A.    Yes.

15   Q.    Now, you also have a right to appeal from any sentence.

16   Every defendant in the Federal system has a right to file an

17   appeal within ten days after they're sentenced and you have

18   that right.  Do you understand that?

19   A.    Yes.

20   Q.    Now Paragraph 6 of your stipulations says that as long as

21   your sentence is determined by total offense level 29 or less,

22   that you wish to give up your right to file an appeal.  Is

23   that correct?

24   A.    Yes.

25   Q.    Have you discussed this with your attorney?

WRIGHT - BY THE COURT

1   A.   Yes, I have.

2   Q.   There's a second right that is mentioned in the Paragraph

3   6 and that is a right to file for post-conviction relief.

4   That's under Section 2255.  Every Federal defendant whose

5   incarcerated has a right for one year after their conviction

6   becomes final to file a 2255 Application with the sentencing

7   Judge.  A 2255 Application says to the Judge, Judge there's

8   been a mistake made in my case that violates the Constitution.

9   Or that violates the Federal statutes.  Please take a second

10  look at it and correct my sentence or set the conviction aside

11  entirely because of the mistake.  Do you understand that you

12  have that right to file a 2255 Application for a year after

13  your conviction?

14  A.   Yes.

15  Q.   Paragraph 6 of your stipulations says that you wish to

16  give up that right, as long as your sentence is determined by

17  level 29 or less.  Is that correct?

18  A.   Yes.

19  Q.   Now you would keep your right.  You would preserve your

20  right to file an appeal or to file a 2255 Application if your

21  sentence turns out to be determined by a level 30 or higher.

22  Do you also understand that?

23  A.   Yes.

24  Q.   Do you have any questions about these rights?

25  A.   No, sir.

*United States District Court*
*Camden, New Jersey*

WRIGHT - BY THE COURT

1  Q.  And do you still wish to plead guilty?

2  A.  Yes, I do.

3  Q.  Okay.  I need to ask you some questions about what you

4  actually did that establishes a factual basis for your guilty

5  plea in this case.  Now do you understand that the Government

6  would have to prove four elements of this charge against you

7  beyond a reasonable.  First, they would have to prove that in

8  or about March of 2004, that you distributed or possessed with

9  intent to distribute a controlled substance?

10  A.  Yes.

11  Q.  Second, they would have to prove the type of controlled

12  substance that you distributed or possessed with intent to

13  distribute was cocaine.  You understand that?

14  A.  Yes.

15  Q.  Third, they would have to prove that the quantity of

16  cocaine that you distributed or possessed it with intent to

17  distribute was an amount in excess of five kilograms.  Do you

18  understand that?

19  A.  Yes.

20  Q.  And, four, they would have to prove that you acted

21  knowingly and intentionally?  Do you understand that?

22  A.  Yes.

23  Q.  Knowing all of that, do you still wish to enter this plea

24  of guilty?

25  A.  Yes.

WRIGHT - BY THE COURT

1   Q.   Are you guilty of this offense?

2   A.   Yes, I am.

3   Q.   Okay.  Please listen carefully to these questions and

4   they're from the memo that came to me from the U. S. Attorney.

5   If you to want follow along.

6            THE COURT:  Do you have that copy of that memo?

7            MR. PINSKY:  Yes, we do, Judge.

8            THE COURT:  It's dated November 12th.

9            MR. PINSKY:  I'm going to put it in front of him,

10  Your Honor.

11           THE COURT:  Was the memo revised, Mr. Fitzpatrick?

12           MR. FITZPATRICK:  It was, Your Honor.  There was a

13  mistake on the dates.  I have the revised version here.

14           THE COURT:  Okay, I better use that one.  It's dated

15  November 12th.

16           MR. FITZPATRICK:  It is.

17           THE COURT:  Okay.

18           MR. FITZPATRICK:  Misspellings.

19  Q.   And, again, if any question I ask is unclear if or it

20  can't exactly be a yes or no, then tell me so.  And give as

21  truthful and complete an answer as you can.  The first

22  question it says:

23           From in or about the end of 2003 through in or about

24  the beginning of 2004, did you acquire large quantities of

25  cocaine from various sources of supply?

*United States District Court*
*Camden, New Jersey*

WRIGHT - BY THE COURT

1   A.   Yes.

2   Q.   In or about March of 2004, did you distribute cocaine to

3   various individuals in and around Salem County, New Jersey?

4   A.   Yes.

5   Q.   Do you agree that in or about March of 2004, you

6   distributed and possessed with intent to distribute more than

7   five kilograms but less than 15 kilograms of cocaine?

8   A.   Yes.

9   Q.   Did you know that the cocaine you distributed and

10  possessed with intent to distribute was an illegal narcotic

11  drug controlled substance?

12  A.   Yes.

13  Q.   Did you do all of these things knowingly and

14  intentionally and willfully?

15  A.   Yes, I did.

16  Q.   Are you guilty of the offense charged in the information?

17  A.   Yes.

18  Q.   Do you agree to be sentenced pursuant to the United

19  States Sentencing Guidelines?

20  A.   Yes.

21  Q.   Do you agree that the facts that are necessary to

22  determine the issues addressed in this, in the stipulations

23  that are contained in the plea agreement, may be established

24  by reliable evidence, including hearsay as provided in

25  Guidelines Section 6(a)1.3 and can be found by the Judge by a

WRIGHT - BY THE COURT

1    preponderance of the evidence?

2    A.    Yes.

3    Q.    In other words, if you agree to this, then the standard

4    of proof would not be proof beyond a reasonable, as the

5    sentencing facts, but instead it would be proof by a

6    preponderance of the evidence?  Do you understand that?

7    A.    Yes, I do.

8    Q.    Do you agree that by consenting to the stipulations

9    contained in the plea agreement, that it is as if the facts

10   that are found pursuant to those stipulations will be charged

11   in an indictment and found by a jury to be proven beyond a

12   reasonable?  Do you understand that?

13   A.    Yes.

14   Q.    In other words, there is an authority in the Supreme

15   Court that a person may have a right to trial by jury on facts

16   that would increase the sentence above the base offense level,

17   and by agreeing to this, are you agreeing to give up that

18   right to trial by jury?

19   A.    Yes.

20   Q.    And do you agree to waive any right to have those facts

21   separately charged in the criminal information in this case?

22   A.    Yes.

23   Q.    And, finally, do you give up your right to have those

24   facts proven beyond a reasonable so long as they're proven to

25   a Judge by a preponderance of the evidence?

WRIGHT - BY THE COURT

1  A.   Yes.

2  Q.   And have you discussed these issues with your attorney?

3  A.   Yes, I have.

4  Q.   And do you have any questions about anything?

5  A.   No.

6  Q.   Do you still wish to plead guilty?

7  A.   Yes.

8       THE COURT:  All right.  Mr. Fitzpatrick, if this case

9  went to trial, is the Government prepared to prove that the

10  illegal drugs the defendant distributed and possessed with

11  intent to distribute was, in fact, more than five kilograms of

12  cocaine?

13      MR. FITZPATRICK:  Yes, Your Honor.

14      THE COURT:  And do you believe that you're prepared

15  to prove each of the elements beyond a reasonable?

16      MR. FITZPATRICK:  Yes, Your Honor.

17      THE COURT:  All right.  Are you satisfied that Mr.

18  Wright's answers establish a factual basis, and that I should

19  accept his plea?

20      MR. FITZPATRICK:  I am, Your Honor.

21      THE COURT:  Mr. Pinsky, are you also satisfied?

22      MR. PINSKY:  Yes, Judge.  Judge, you asked me earlier

23  about the date the plea agreement was signed.

24      THE COURT:  Yes.

25      MR. PINSKY:  I've checked my file.  Although it was

WRIGHT - BY THE COURT

1   signed earlier, I re-signed it, he re-signed it on

2   August 26th, 2004 because it was sent directly on August 27th

3   that the comment is made that it was signed.

4          THE COURT:  Okay.

5          MR. PINSKY:  I think Miss Carle took time out to have

6   a baby and there was some delay.  So I had to re-sign the

7   signed again and send it on the 27th.

8          THE COURT:  Okay.  So it's signed August 27th?

9          MR. PINSKY:  August 26th.

10         THE COURT:  August 26th.

11         MR. PINSKY:  Yes.

12         THE COURT:  Okay.

13  By the Court:

14  Q.  Mr. Wright, do you agree?

15  A.  Yes, I do.

16         THE COURT:  Okay.  Mr. Wright, I will accept your

17  plea of guilty.  I find there is a factual basis that you are

18  in fact guilty of the offense charged.  I find that all the

19  requirements of Rule 11 of the Federal Rules of Criminal

20  Procedure have been satisfied by today's hearing.  And I'll

21  request the clerk to enter a disposition of guilty and set the

22  case for sentence for Friday April 8th at 9:30 in the morning.

23         All right.  Let's talk about bail.  And Mr. DiGiacomo

24  is here from the Pretrial Services Department.  Has anyone

25  received a copy of the --

1          MR. PINSKY:  No.  I actually didn't get one yet,

2     Judge.

3          THE COURT:  The Pretrial Services report.  Okay, take

4     a moment to look it over.  Let me know when you're ready.  Mr.

5     Wright should review it, too.

6          MR. PINSKY:  Yes.

7          (Brief pause)

8          MR. PINSKY:  We've read it, Judge.

9          THE COURT:  Okay.

10              (Brief pause)

11         MR. FITZPATRICK:  Your Honor.

12         THE COURT:  Mr. Fitzpatrick.

13         MR. FITZPATRICK:  May I just address one or two

14    issues with the court?

15         THE COURT:  Yes.

16         MR. FITZPATRICK:  On page -- I guess the last page of

17    the criminal history on the pre -- or Pretrial Services

18    report.  The November 3rd, 03 as well as the April 19th, 04 is

19    instances, are all acts that are subsumed within the

20    conspiracy that Mr. Wright pled guilty to today.

21         THE COURT:  Okay.  So where it says case referred to

22    Federal prosecution, that would include the November 3rd one

23    as well.

24         MR. FITZPATRICK:  As well as the November 3rd one as

25    well.

1          THE COURT:  Okay.

2          MR. FITZPATRICK:  Yes.  Your Honor, since Mr.

3     Wright's contact with local authorities in Salem County as

4     well as the DEA in about I believe May of -- at the end of

5     April, beginning of May of 04, Mr. Wright has been in -- he's

6     been supervised by Salem County.  And he has been in close

7     contact with law enforcement both from the DEA as well as the

8     Salem County Prosecutor's Office.  There has -- through that,

9     I suppose through that period of time, six, seven months.  In

10    any event, Mr. Wright was accessible to the agent.  He's been

11    accessible to the local authorities, and I think if there was

12    a realistic flight, risk of flight, it would have been --

13    would have happened during that period of time.

14         So I think based on -- so I think his track record

15    there seems to suggest that he would not necessarily be a risk

16    of flight between now and the time of sentencing.  In

17    addition, he has taken great steps toward his sentence

18    reduction motion and any flight -- whatever concern generally

19    for someone to flee because of the length of incarceration, is

20    somewhat lessened in this regard.

21         He does have an extensive criminal history beyond.

22    This current, this current conspiracy which he pled and

23    obviously it's set forth in the Pretrial Services report.

24    However --

25         THE COURT:  Including being sentenced to ten years in

WRIGHT - BY THE COURT

1    prison for distribution in '91.

2           MR. FITZPATRICK:  Yes.  Yes, sir.  I mean there's an

3    extensive, there is an extensive criminal history.  There's no

4    question about it.  I was trying to offer to the court just a

5    full background of what's going on in the last six or seven

6    months so the court has all the information.

7           THE COURT:  Yes.

8           MR. FITZPATRICK:  He has been out.  He has been

9    cooperating.  He has been working.  He has been accessible.

10   There has been no reason to believe he's been engaged in any

11   criminal activity during that point.  The agents have been

12   able to corroborate much of what Mr. Wright has told them

13   through an independent source which obviously indicates that

14   he's being, you know, that he was being forthright with them.

15   To the best that he could.  To the best they were able to

16   corroborate.  That's really the general scope of what's going

17   on in the last five or six months.

18          THE COURT:  Is he still needed on the street in terms

19   of cooperation?

20          MR. FITZPATRICK:  No, Your Honor.  He has, in fact,

21   one of, in fact, one of the reasons why -- just to give the

22   Court even a greater understanding of what's going on.  In

23   fact, what had happened Mr. Pinsky can correct me if I

24   misstate it, any of this.  There was extensive cooperation not

25   only with Federal authorities that has resulted in at least

WRIGHT - BY THE COURT

1    one Federal arrest.  A core case that's being adopted by our

2    office in addition to the Salem County Prosecutor's Office,

3    which has, I think, indicted 10 or 12 individuals.  The --

4    after Salem County had made their arrest, through I think what

5    can only be characterized as a mistake by the Salem County

6    Prosecutor's Office, they identified Mr. Wright in a newspaper

7    article as being somebody who was cooperating with law

8    enforcement.  It was a published newspaper article.  In fact,

9    I have the article here.  Mr. Pinsky notified me.  He was

10   reading it in the paper.  He notified me.  We contacted the

11   DEA.  We contacted Mr. Wright, took whatever steps were

12   immediately necessary.  But my response to Mr. Pinsky at this

13   time was to immediately bring Mr. Wright in, have him plead

14   and have him immediately go into custody.  For several

15   logistical reasons we were unable to do that for the last six

16   or eight weeks.  So Mr. Wright has been out.  We feel like

17   whatever threat may have existed has been greatly defused by

18   certain steps taken by Mr. Wright, taken by the supervising

19   agencies.

20        To answer Your Honor's -- so, if for, for no other

21   reason than that, I don't feel comfortable putting

22   Mr. Wright in a position where he's doing anything proactive.

23   The fact that he has been exposed in a public forum.  So I

24   guess the last six or seven weeks that way have indicated that

25   there isn't and there is an immediate threat to Mr. Wright.

1      I think that brings us back to treating this as for a

2 typical bond situation.  You know, based on flight risk, based

3 on the defendant's criminal history, suggesting a continued

4 danger to the community.  And for that, the criminal history

5 is what it is.  Mr. Wright, as I indicated to the court, has

6 met his obligations to this date with the agents.  Always done

7 so I think in a responsible way.  And that's what I offer to

8 the court.

9      THE COURT:  Do you believe his testimony will be

10 needed in other cases?

11      MR. FITZPATRICK:  If any of these individuals go to

12 trial, Mr. Wright will certainly be needed to testify.  The

13 one case that we have arrested one individual who we believe

14 was one of Mr. Wright's suppliers.  If that individual goes to

15 trial, Mr. Wright would certainly be needed to testify.  I

16 would assume that if the individuals charged in Salem County,

17 which we have for various reasons declined to prosecute, I

18 would assume the Salem County Prosecutor's Office would also

19 require Mr. Wright to testify if any of those individuals go

20 to trial.

21      THE COURT:  Again he's living then in Delaware still?

22      MR. PINSKY:  Currently.

23      MR. FITZPATRICK:  Currently.  But my understanding is

24 for various reasons that if the court were to leave him out on

25 bond, he would not be staying in that location.  We know where

WRIGHT - BY THE COURT

1    he would be going.  Obviously Pretrial Services would notify

2    the court.  It would be out of the immediate vicinity.  But,

3    again, obviously that depends on the court's ruling with

4    respect to bond.

5           THE COURT:  Okay.  Mr. Pinsky, is Mr. Right working

6    every day?

7           MR. PINSKY:  Yes, he is, every day, Judge.  He has a

8    job as a pipe fitter.  Something he's skilled at, and he's

9    making good money.  And working every day.  He's residing in a

10   permanent relationship with a woman in the place -- address

11   which I don't want to mention on the record.  And they have

12   twins which are how old how now?  Sixteen months.  They are

13   his first two children.  Judge, that unfortunate article was

14   published in the Salem County Sun Beam.  It basically said all

15   these indictments were the result of him cooperating.  The

16   federal people needed him for a very large arraignment,

17   despite the fact that this was ripe, fresh.  After it

18   happened, he kept going with it.  And as a result, there was

19   an arrest of I think 37 people.  Three people of significance.

20   He did that after he was made known.  He has no fear now for

21   his safety, of any great nature.  He's not in the immediate

22   area.  His whole family comes from Salem County.  His mother,

23   his siblings are law-abiding people and he sees them

24   regularly.  So, I mean I think there's no risk of flight.  I

25   think that as Mr. Fitzpatrick said, he has taken gigantic

WRIGHT - BY THE COURT

1  steps towards earning his 5(k)1 and his other departure.  And

2  he is being consulted still by local representatives of the

3  police department, not the Federal people, and providing them

4  with information.  They're not being asked to do anything

5  active right now.  But he is still providing them with

6  intelligence at this time.

7       THE COURT:  Which hopefully they don't publish it in

8  the Salem Sun Beam.

9       MR. PINSKY:  I hope not, Judge.  And part of that is

10  from the Salem County Prosecutor's mouth.

11       THE COURT:  Really.

12       MR. PINSKY:  Yes.

13       THE COURT:  That's unfortunate.  Okay.  Thank for

14  filling me in because on the face, on the face of the

15  circumstances here, having pled guilty to such a serious

16  crime, I would have revoked bail and just, you know, let Mr.

17  Wright start serving his time and accumulating credit.  But

18  the Government not moving that for pretrial detention and I

19  have a recommendation moving for pretrial, for bail in the

20  amount of an unsecured bond of a hundred fifty thousand

21  dollars and reporting to Pretrial Services as directed.

22  Surrender his passport.

23       MR. PINSKY:  He has no passport, Judge.

24       THE COURT:  All right.  And not obtain any new

25  passport either.  That would be a condition.  Restrict travel

1    to New Jersey, Maryland and Delaware?

2              THE DEFENDANT:  Yes.

3              THE COURT:  Drug testing, drug treatment as directed

4    by --

5              MR. PINSKY:  Judge, we need Pennsylvania, too,

6    because that's where we works.  Eastern Pennsylvania, right?

7              THE DEFENDANT:  Yes.  Just the Philadelphia area.

8              MR. PINSKY:  Eastern Pennsylvania.

9              THE COURT:  Okay.  I'll include the Eastern District

10   of Pennsylvania.  Now, does Mr. Wright own any weapons?

11             THE DEFENDANT:  No.

12             THE COURT:  And do you have access to any weapons in

13   your house?

14             THE DEFENDANT:  No.

15             THE COURT:  Because you would have to surrender

16   those.  You're not permitted to possess any weapons while out

17   on bail.  Any objection to either side to these conditions?

18             MR. FITZPATRICK:  No.

19             MR. PINSKY:  No objection, your Honor.

20             THE COURT:  Okay.  It will take me a minute to fill

21   in the order for bail.

22                  (Brief pause)

23             THE COURT:  Has Mr. Wright been processed by the

24   marshals yet?

25             MR. PINSKY:  No.  He's going to go there from here,

WRIGHT - BY THE COURT

1  Judge.

2         THE COURT:  Okay.  Then from there, he has to go to

3  the Probation Department on the first floor of the old court

4  house.

5         MR. PINSKY:  Then he needs to stop by Mr.

6  DiGiacomo's.

7         THE COURT:  Okay.  Well, here's the order setting

8  conditions for release.  Again it's an unsecured bond in the

9  amount of a hundred fifty thousand dollars.  That amount would

10 be forfeited to the United States if there's any violation of

11 bail.  Report to Pretrial Services as directed.  I put the

12 telephone number in here.  Obtain no new passport, no travel

13 outside of New Jersey, Maryland, Delaware and the Eastern

14 District of Pennsylvania.  Don't possess any firearms or other

15 dangerous weapons.  Don't possess any narcotic drug or

16 controlled substance.  Submit to testing as required by

17 Pretrial Services.  And if testing is positive, you must

18 participate in a program as directed by Pretrial Services.

19 The basic conditions plus all of the other preprinted ones

20 that are on here.

21        MR. PINSKY:  Understood, Your Honor.

22        THE COURT:  Okay.  Anything else?

23        MR. FITZPATRICK:  No, Your Honor.

24        MR. PINSKY:  Nothing, Your Honor.

25        THE COURT:  All right, then we'll just need Mr.

WRIGHT - BY THE COURT

1   Wright to sign the order on the bond, then he'll be free to

2   leave.

3           MR. PINSKY:  Thank you, Judge.

4           THE COURT:  Okay.  Thank you.

5           MR. FITZPATRICK:  Thank you, Judge.

6           (The matter was then concluded)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SHAWN WRIGHT,                   :

                                    :

        Plaintiff,            :

                                      :

        v.                    :       C. A. No. 08-099-GMS

                                    :

JAMES E. LIGUORI; LIGUORI, MORRIS &  :

YIENGST; and WACHOVIA BANK NATIONAL  :

ASSOCIATION,                     :

                                    :

        Defendants.          :

---

## CERTIFICATE OF SERVICE

I, **Norman H. Brooks, Jr.,** hereby certify that on  **August 22, 2008,** I electronically filed

an **Opposition of Defendants James E. Liguori and Liguori, Morris & Yiengst to Plaintiff's**

**Motion to Appoint Counsel** with the Clerk of Court using CM/ECF.  I have also served, via

first class mail, two copies of same to the *Pro Se* Plaintiff:

        Mr. Shawn Wright
        40987-050
        FCI - Fairton
        P.O. Box 420
        Fairton, NJ  08320

                                  */s/ Norman H. Brooks, Jr.*
                                  Norman H. Brooks, Jr., Esquire (2568)
                                  Marks, O'Neill, O'Brien & Courtney, P.C.
                                  913 North Market Street, #800
                                  Wilmington, DE 19801
                                  (302) 658-6538
                                  *Attorney for Defendant Liguori, Morris*
                                  *& Yiengst*